STEVEN G. KALAR
Federal Public Defender
Northern District of California
HANNI FAKHOURY
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone: (510) 637-3500
Facsimile: (510) 637-3507
Email: Hanni_Fakhoury@fd.org

Attorneys for JEFFREY PROVOST

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| UNITED STATES OF AMERICA, | Case No.: CR 18-00186-YGR |
|---|---|
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | |
| JEFFREY PROVOST, | **Court:** Courtroom 1, 4th Floor |
| Defendant. | **Hearing Date:** January 10, 2019 |
| | **Hearing Time:** 2:00 p.m. |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION .............................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................................. 1

    A.    Mr. Provost's History and Characteristics. ......................................................................... 1

    B.    The Nature and Circumstances of the Offense. ................................................................. 3

    C.    Court Proceedings. ............................................................................................................. 4

    D.    Mr. Provost's Future Rehabilitation Goals and Plans. ...................................................... 4

ARGUMENT ..................................................................................................................................... 5

    A.    Seriousness of the Offense, Respect for the Law and Just Punishment. .......................... 5

    B.    Deterring Criminal Conduct and Protecting the Public. .................................................... 6

    C.    Providing Training, Medical Care or Other Treatment. .................................................... 9

    D.    The Guidelines Sentencing Range. ................................................................................. 10

    E.    Avoiding Unwarranted Sentencing Disparities. .............................................................. 11

    F.    Providing Restitution. ...................................................................................................... 11

    G.    Mr. Provost is Not Subject to the $5,000 Special Assessment Because he is Indigent. . 11

CONCLUSION ................................................................................................................................ 12

# TABLE OF AUTHORITIES

## Cases

*Gall v. United States*, 552 U.S. 38 (2007) .................................................................................5, 11

*Paroline v. United States*, 572 U.S. 434 (2014) ............................................................................11

*Tapia v. United States*, 564 U.S. 319 (2011) .................................................................................10

*United States v. Amezcua-Vasquez*, 567 F.3d 1050 (9th Cir. 2009) ..............................................11

*United States v. Bad Marriage*, 392 F.3d 1103 (9th Cir. 2004) ......................................................9

*United States v. Barker*, 771 F.2d 1362 (9th Cir. 1985) ..................................................................5

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) (en banc) ......................................................5

*United States v. Johnson*, 529 U.S. 53 (2000) ...............................................................................10

*Williams v. New York*, 337 U.S. 241 (1949) ....................................................................................5

## Statutes

18 U.S.C. § 2422 ...................................................................................................................9, 10, 12

18 U.S.C. § 3013 ...............................................................................................................................12

18 U.S.C. § 3014 .........................................................................................................................11, 12

18 U.S.C. § 3553 ............................................................................................................................5, 9

18 U.S.C. § 3582 ...............................................................................................................................10

34 U.S.C. § 20911 ...............................................................................................................................6

34 U.S.C. § 20913 ...............................................................................................................................6

34 U.S.C. § 20915 ...............................................................................................................................6

## United States Sentencing Guidelines ("U.S.S.G.")

U.S.S.G. § 2G1.3 ........................................................................................................................10, 11

U.S.S.G. § 5G1.1 ...............................................................................................................................10

U.S.S.G. § 3E1.1 ...............................................................................................................................10

DEFENDANT'S SENTENCING MEMORANDUM
*PROVOST*, CR 18–00186-YGR

ii

**Reports**

Cohen, et al., "How Dangerous Are They? An Analysis of Sex Offenders Under Federal Post-Conviction Supervision," *Federal Probation*, Vol. 80, No. 2 (Sep. 2016), *available at* https://www.uscourts.gov/sites/default/files/80_2_4_0.pdf ............................................................ 8

Roger Pryzbylski, "Recidivism of Adult Sexual Offenders," U.S. Department of Justice, Office of Justice Programs, Sex Offender Management Assessment and Planning Initiative (SOMAPI) Research Brief, July 2015, *available at* https://www.smart.gov/pdfs/RecidivismofAdultSexualOffenders.pdf ........................................... 8

U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, November 2017, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf .................................... 7

**Other Authorities**

7A Guide to Judiciary Policy § 210.40.30 ................................................................................. 12

"Indigent Defendant," *Black's Law Dictionary* (10th Ed. 2014) ............................................. 12

**INTRODUCTION**

Mr. Provost's life has been filled with mistakes. Alcoholism cost him his job and his first marriage. His inability to confront his alcoholism deteriorated his mental health and lead to thoughts of suicide. His unwillingness to follow through with mental health treatment led him to the mistake that will now send him to prison for the next ten years. At 47 years old, his growing isolation, mood instability and alcohol dependency lead him to make the mistake of communicating with a minor online, culminating in him exchanging sexually explicit images with her. Mr. Provost has no one to blame for these mistakes but himself. And it will fall on his shoulders to bear the heavy burden of tackling his alcoholism and mental health issues as a convicted felon and sex offender.

The government and probation office agree that ten years in prison is the appropriate sentence in this case. It swiftly and harshly punishes Mr. Provost for his crime and gives him an opportunity to work on his rehabilitation and make restitution to the minor from outside the prison walls. He thus asks this Court to follow the joint recommendation of the parties and sentence him to serve 120 months in the custody of the Bureau of Prisons ("BOP"), followed by ten years of supervised release. He also asks this Court to impose a $100 special assessment because he is indigent.

**STATEMENT OF FACTS**

A.  **Mr. Provost's History and Characteristics.**

On the surface, Mr. Provost's upbringing was better than many of the individuals who appear before this Court for sentencing. He was born in Woonsocket, Rhode Island, which is 15 miles north of Providence, Rhode Island, and approximately 50 miles southwest of Boston, Massachusetts. Presentence Investigation Report ("PSR") ¶ 59. He was raised by both of his parents and had a good childhood free from abuse. PSR ¶ 61.

But beneath that surface, Mr. Provost's upbringing had a darker side this Court sadly sees all too often: rampant substance abuse. Starting at the age of 12, Mr. Provost consumed any and all substances he could get his hands on. At 13 years old, he was drinking three beers a day, three times a week. PSR ¶ 76. By 14, he was smoking three marijuana joints daily. PSR ¶ 77. Weekly cocaine use began when he was 15 years old. PSR ¶ 78. His drug and alcohol use increased as he got older. By the time he graduated high school, he was using cocaine four times a week. By 35, he was

drinking six beers and four to five small bottles ("nips") of 80 proof alcohol daily, to the point of blacking out. PSR ¶ 76. Mr. Provost's aggressive substance abuse put a significant strain on his relationship with his family. As his mother told the probation officer, "everybody tried to help him with his substance abuse issues; however, toward the end it was somewhat helpless." PSR ¶ 82. He has had no contact with his siblings since he was arrested and received no response from his brother after sending him a letter. PSR ¶ 66.

Given his drug use, it was no surprise that Mr. Provost graduated near the bottom of his class in 1988. PSR ¶ 83. But he was able to find a job as a machinist for several years before he was laid off. PSR ¶ 90. He then worked as a machine operator for 14 years at a plastics company in Sheffield, Massachusetts, approximately 120 miles west of Woonsocket. PSR ¶ 89. Around that time, he married his first wife. PSR ¶ 61. The couple had problems with alcohol, though things calmed down when Mr. Provost's daughter was born in 2001. From 2001 to 2003, Mr. Provost was sober. PSR ¶ 76. In 2004, the couple separated and Mr. Provost's alcohol and drug use resumed. PSR ¶¶ 62, 76.

In 2008, Mr. Provost met a woman online and the two got married after dating for six months. PSR ¶ 63. Mr. Provost left his long term job to move to Florida. PSR ¶ 89. The marriage was volatile, with alcohol fueled domestic violence. PSR ¶ 63. The relationship ended in 2010 and Mr. Provost returned to Rhode Island.

Although he found work, his substance abuse quickly and unsurprisingly became an impediment. After a year as a machine operation at a syrup company, he was terminated for insubordination. PSR ¶ 87. He then struggled to find work or keep a stable residence. By February 2017, Mr. Provost was jobless and homeless, living in his car. PSR ¶ 71. Any money he earned doing odd landscaping jobs he spent on alcohol and drugs.

In March 2017, he checked himself into Butler Hospital in Providence, Rhode Island, after he felt suicidal. PSR ¶ 71. He began mental health and drug abuse treatment the following month while living in a sober living house. In August 2017, he was prescribed Antabuse, a medication that produces a sensitivity to alcohol and an uncomfortable reaction when a person taking the medicine

drinks alcohol.[1]  PSR ¶ 72.  But Mr. Provost's efforts at treatment and sobriety were fleeting.  His attendance at Alcoholics Anonymous meetings decreased and he began to cancel and eventually stop attending monthly follow up treatment appointments.  *Id.*  He drank heavily and was kicked out of the sober living house after causing a small kitchen fire when cooking sausages drunk.  PSR ¶ 80.

By January 2018, Mr. Provost was feeling suicidal again and checked himself back into Butler Hospital.  PSR ¶ 74.  He was drinking seven to eight nips of 100 proof Schnapps daily and smoking marijuana two to three times a week.  *Id.*  He detoxed in the hospital for several days before being released with medications, including Zoloft for depression, Trazadone for insomnia and Depakote to stabilize his mood.  *Id.*  He again found work in landscaping and rented a small room in Woonsocket, which is where he was living at the time of his arrest in April 2018.  PSR ¶ 64.

**B.     The Nature and Circumstances of the Offense.**

As Mr. Provost explained to the probation officer, alcohol and drugs "shut down" his brain, and directly led to the commission of the crime here.  PSR ¶ 81.  In August 2017, while Mr. Provost had relapsed into alcohol abuse and stopped attending counseling appointments and AA meetings, he met the minor online in a Facebook group.

The minor explained she was invited to join a sexual Facebook group.  Mr. Provost was a member of that Facebook group but did not invite her to join the group.  Several other people reached out to the minor online on Facebook and Snapchat, and she told school resource officers that she sent nude photos of herself to twenty different people online.  PSR ¶ 9.  Mr. Provost and the minor communicated online several times between September 2017 and March 2018, eventually exchanging nude images of each other and masturbating together via video chat.  At some point, the minor told Mr. Provost she was 13 years old.  PSR ¶ 9.  Mr. Provost shared one of the minor's images with another person online.  PSR ¶ 6.

Eventually, investigators determined the minor sent nude images of herself to nine specific Facebook accounts.  PSR ¶ 7.  Seven of the accounts belonged to users located abroad; the two domestic accounts belonged to Mr. Provost and another man, Paul Michael Bergin, who is being

---

[1] *See* National Institute of Health, U.S. National Library of Medicine, "Disulfiram," *available at* https://medlineplus.gov/druginfo/meds/a682602.html.

prosecuted in the Western District of Washington. *See United States v. Bergin*, 18-CR-5363-RJB (W.D. Wash.). Communication between Mr. Provost and the minor stopped in March 2018.

A complaint was filed in the Northern District of California on April 20, 2018. On April 24, 2018, a search warrant was executed at Mr. Provost's small room in Woonsocket, Rhode Island. PSR ¶ 29. Mr. Provost was cooperative with officials and did not resist arrest. He was taken to a Secret Service office in Providence, Rhode Island, where he gave up his *Miranda* rights and talked to law enforcement officials. PSR ¶¶ 30-33. Mr. Provost was honest with them, acknowledging he made a serious mistake by talking and exchanging pictures with the minor. PSR ¶ 33. He told officers he had "mental issues but was not going to blame it all on that," and recognized that every time he drank too much, "stuff came out of his mouth that he did not mean." *Id.* He told officers he wanted to tell the minor he was sorry for the harm he caused her. *Id.*

**C.     Court Proceedings.**

Mr. Provost had his initial appearance in federal court in Rhode Island on the same day he was arrested. He waived his right to an identity and removal hearing, and was ordered removed to the Northern District of California that same day. Dkt. 3, PSR ¶ 5. While Mr. Provost was in transit to California, the indictment was filed on May 3, 2018. Dkt. 5; PSR ¶ 2. Mr. Provost made his initial appearance in this district on May 23, 2018. Dkt. 7; PSR ¶ 5. A week later, Mr. Provost waived his right to a detention hearing and agreed to remain in custody. Dkt. 10; PSR ¶ 5. By the time Mr. Provost made his first appearance before this Court five weeks later, the parties were close to resolving the case. Dkt. 12. Mr. Provost ultimately entered into a Rule 11(c)(1)(C) plea agreement with the government, agreeing to a sentence of ten years in prison, ten years of supervised release, a $100 special assessment and restitution. He entered a guilty plea on August 23, 2018. Dkt. 17, 18.

**D.     Mr. Provost's Future Rehabilitation Goals and Plans.**

Mr. Provost understands he has much work to do to repair the damage he has caused himself, his family and, most importantly, the minor. As he explained to the probation officer, he feels "sorry and ashamed for the harm I have caused the victim, and cannot begin to comprehend the lasting damage I've caused her." PSR ¶ 36. He also looks "forward to seeking help and taking advantage of the programs available to me so I can rebuild my life." *Id.*

That means while he is serving his lengthy sentence, Mr. Provost hopes to participate in the BOP's Residential Drug Abuse Program ("RDAP") and Sex Offender Treatment Program. If the Court accepts the plea agreement and sentencing recommendation of ten years in prison, Mr. Provost will be in his mid-50s when released. He plans to return to Rhode Island and have his supervised release term transferred there and continue with drug and alcohol treatment, mental health counseling, and sex offender treatment. He understands he will have to register as a sex offender for at least 25 years. But he is eager to reunite with his family and find work so he can begin to compensate the minor for the damage he has caused her.

## ARGUMENT

Criminal "punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). That requires "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quotations omitted). The factors detailed in 18 U.S.C. § 3553(a) assist the Court in fulfilling this mandate to make "an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime." *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985). The sentence recommended in the United States Sentencing Guidelines ("U.S.S.G.") is only one factor for district courts to consider in making this judgment, and it may not be weighed more heavily than any other § 3553(a) factor. *Gall*, 552 U.S. at 50; *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).

Here, the joint recommendation of 120 months of custody, ten years of supervised release and a $100 special assessment furthers all of the § 3553(a) goals.

**A.    Seriousness of the Offense, Respect for the Law and Just Punishment.**

There is no question that the crime Mr. Provost was convicted of is extremely serious and requires a significant sentence. At the same time, the Supreme Court has warned "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54 (quotations omitted).

The joint recommendation of ten years in prison, followed by ten years of supervised release, is a harsh punishment that takes "into account the real conduct and circumstances" here. A ten year sentence sends a strong message that improper online communications with minors will lead to a decade behind bars.

Moreover, a major consequence of Mr. Provost's conviction will be the requirement he register as a sex offender for up to the next twenty-five years. *See* 34 U.S.C. §§ 20913(a) (registration requirements); § 20915(a)(2) (twenty-five year registration period for tier II sex offender); § 20911(3) (defining "tier II sex offender"). Sex offender registration has weighed heavily on Mr. Provost, and he knows it will be an obstacle in achieving his future goals. PSR ¶ 67. This is a significant collateral consequence of his actions, which demonstrates the seriousness of the offense and will encourage others to respect the law.

Finally, and perhaps most importantly, the joint recommendation in the plea agreement spares the minor the trauma and embarrassment of reliving her experiences in Court before a jury. That too is a "circumstance" that justifies the ten year sentence agreed to by the parties.

**B.    Deterring Criminal Conduct and Protecting the Public.**

The probation officer recognizes that the ten year sentence Mr. Provost has agreed to serve is a "lengthy sentence [that] will deter him from engaging in any future criminal conduct, and afford him the opportunity to continue addressing his substance abuse and mental health issues." PSR Sentencing Rec. at 3. Until this case, Mr. Provost had not served more than a few days in jail, had never been convicted of a felony or any sex offense, or faced the possibility of a prison sentence and sex offender registration. That has all changed now. A sentence longer than ten years is unnecessary to deter Mr. Provost from engaging in criminal conduct again.

In fact, it is statistically unlikely Mr. Provost will commit another crime again, let alone a new sex offense. First, studies have repeatedly shown that older defendants are at a lower risk of reoffending. A comprehensive 2017 U.S. Sentencing Commission ("U.S.S.C.") study of recidivism rates of more than 25,000 offenders released from the BOP in 2005 confirms this notion.[2]



Mr. Provost is currently 48 years old and if sentenced to 120 months, will be released sometime in his mid-to-late 50s. Defendants in the U.S.S.C. study between 55 and 59 years old at the time they were released from their federal sentences had a rearrest rate of 22.2%, a reconviction rate of 12.2% and a reincarceration rate of 9%. That was significantly lower than the total rearrest rate of 49.3%, reconviction rate of 31.7%, and reincarceration rate of 24.7% for all offenders studied by the Sentencing Commission.

---

[2] *See* U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, November 2017, p. 23, Figures 13-15, Appendix A-38, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.

DEFENDANT'S SENTENCING MEMORANDUM
*PROVOST*, CR 18–00186-YGR

Second, when it comes to sex offenses, the Department of Justice itself has found that the "sexual recidivism rate" for sex offenders is significantly lower than the general recidivism rate overall. That is, "sex offenders—regardless of type—have higher rates of general recidivism than sexual recidivism," and have "lower overall recidivism rates than non-sexual offenders."[3] The DOJ's own data suggests Mr. Provost is unlikely to commit another crime, let alone a sex offense, again.

A more detailed study by Federal Probation adds additional data to support this point.[4] Probation analyzed approximately 7,416 male sex offenders released from the BOP and placed on supervised release between 2007 and 2013. It further split sex offenders into four main categories based on their underlying federal offense: child pornography, transportation for illegal sexual activity, sexual abuse or assault, and Sex Offender Registration and Notification Act ("SORNA") violations. Probation compared recidivism rates for all four categories of sex offenders to recidivism rates for approximately 180,000 male non-sex offenders placed on supervised release during the same time period. Probation found that sex offenders as a whole had lower recidivism rates than offenders convicted of non-sex offenses.[5]

| **Recidivism Outcomes** | | | | | |
|---|---|---|---|---|---|
| | Any Arrest | Major Arrest | Non-Sexual Violent Arrest | Any Sex Arrest | Probation Revocation |
| Non-Sex offender | 31.4% | 23.0% | 7.9% | 0.5% | 22.6% |
| Sex offender | 17.5% | 7.8% | 1.8% | 2.8% | 19.2% |

---

[3] *See* Roger Pryzbylski, "Recidivism of Adult Sexual Offenders," U.S. Department of Justice, Office of Justice Programs, Sex Offender Management Assessment and Planning Initiative (SOMAPI) Research Brief, July 2015, at p. 2, *available at* https://www.smart.gov/pdfs/RecidivismofAdultSexualOffenders.pdf.

[4] *See* Cohen, et al., "How Dangerous Are They? An Analysis of Sex Offenders Under Federal Post-Conviction Supervision," *Federal Probation*, Vol. 80, No. 2 (Sep. 2016), *available at* https://www.uscourts.gov/sites/default/files/80_2_4_0.pdf.

[5] *Id.* at p. 27, Figure 5.

DEFENDANT'S SENTENCING MEMORANDUM
*PROVOST*, CR 18–00186-YGR

Moreover, probation noted offenders convicted of illegal transportation offenses—which included defendants like Mr. Provost convicted of enticement of a minor under 18 U.S.C. § 2422—"were rearrested or revoked at rates more similar to the child pornography than to the sexual assault and SORNA offenders."[6]

| **Sex Offender Recidivism Outcomes** | | | | | |
|---|---|---|---|---|---|
| | Any Arrest | Major Arrest | Non-Sexual Violent Arrest | Any Sex Arrest | Probation Revocation |
| Child Pornography | 13.0% | 4.9% | 0.5% | 2.6% | 11.6% |
| Transportation for Illegal Sexual Activity | 17.3% | 7.8% | 1.6% | 2.4% | 14.4% |
| Sexual Assault | 23.1% | 9.9% | 3.6% | 2.2% | 38.5% |
| SORNA | 41.8% | 26.1% | 8.0% | 7.7% | 47.2% |

As for protecting the public, the combination of sex offender registration and supervised release will ensure Mr. Provost's actions are closely scrutinized and monitored. Thus, there is no need to impose a prison sentence longer than ten years.

C.     **Providing Training, Medical Care or Other Treatment.**

"The underlying purposes of sentencing include not only punishment and deterrence, but also the provision of treatment to a defendant in need of it." *United States v. Bad Marriage*, 392 F.3d 1103, 1114 (9th Cir. 2004) (citing 18 U.S.C. § 3553(a)(2)(D)). As the probation officer notes, Mr. Provost has "a lengthy history of mood instability" and "a long history of substance" abuse. PSR Sentencing Rec. at 2. The probation office recommends, and Mr. Provost acknowledges he needs, substance abuse and mental health counseling. Mr. Provost is eager to participate in both the BOP's Residential Drug Abuse Program (RDAP) and Non-residential Sex Offender Treatment Program.

But despite the treatment he will receive in the BOP, the harder and more necessary treatment for Mr. Provost will come when he is out of custody. Congress has cautioned courts to recognize that

---

[6] *Id.* at p. 30.

DEFENDANT'S SENTENCING MEMORANDUM
*PROVOST*, CR 18–00186-YGR

9

1  "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. §
2  3582(a).  Indeed, the Supreme Court has explained a district court cannot increase the length of a
3  sentence in order to provide a defendant with rehabilitative services.  *See Tapia v. United States*, 564
4  U.S. 319, 327 (2011) (a court determining the length of a prison sentence "should consider the
5  specified rationales of punishment *except for* rehabilitation, which it should acknowledge as an
6  unsuitable justification for a prison term.") (emphasis in original).
7  Rather, "Congress intended supervised release to assist individuals in their transition to
8  community life. Supervised release fulfills rehabilitative ends, distinct from those served by
9  incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000) (citing 18 U.S.C. § 3553(a)(2)(D)).
10 Probation acknowledges that a ten year term of supervised release will assist Mr. Provost into "his
11 transition into the community."  PSR Sentencing Rec. at 3.  Thus, giving Mr. Provost the resources of
12 Probation office to combat his lifelong alcoholism and drug addiction will be more effective at
13 ensuring he is not a danger to the public than a prison sentence longer than ten years.

14 **D.     The Guidelines Sentencing Range.**

15 The parties agree on the advisory Guideline range that applies in this case.  PSR ¶ 4.  Because
16 Mr. Provost was convicted of violating 18 U.S.C. § 2422(b), the base offense level is 28 under
17 U.S.S.G. § 2G1.3(a)(3).  PSR ¶ 38.  Because the crime involved the use of a cell phone, an additional
18 two levels are added under U.S.S.G. § 2G1.3(b)(3).  PSR ¶ 39.  Another two levels are added under
19 U.S.S.G. § 2G1.3(b)(4) because the offense involved the commission of a sex act.  PSR ¶ 40.
20 Because Mr. Provost pleaded guilty quickly in his case and expressed remorse for his actions, he
21 receives a three level reduction for acceptance of responsibility under U.S.S.G. §§ 3E1.1(a) and (b).
22 PSR ¶¶ 46-47.  Thus, the adjusted offense level is 29.  PSR ¶ 48.  Mr. Provost has two criminal
23 history points, stemming from two misdemeanor convictions where he received probation and no jail
24 time.  PSR ¶¶ 51-52, 54.  Thus, Mr. Provost is in criminal history category II.  PSR ¶ 54.  The
25 advisory Guideline range is therefore between 97-121 months.  However, because there is a
26 statutorily mandated 120 month minimum sentence, the Guideline range under U.S.S.G. §
27 5G1.1(c)(2) becomes 120-121 months.  PSR ¶ 95.  The parties are jointly recommending a Guideline
28 sentence of 120 months of custody, followed by ten years of supervised release.

E.  **Avoiding Unwarranted Sentencing Disparities.**

While the Court must avoid unwarranted sentencing disparities among defendants with similar records convicted of similar conduct, the Ninth Circuit has explained sentencing courts must also "avoid 'unwarranted similarities among [defendants] who were not similarly situated.'" *United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1058 (9th Cir. 2009) (quoting *Gall*, 552 U.S. at 55 (emphasis and brackets in original)); *see also* 18 U.S.C. § 3553(a)(6).

A ten year sentence avoids unwarranted sentencing disparity. It is a harsh sentence that distinguishes Mr. Provost from someone who merely possessed child pornography. But it also ensures he is not equated with a defendant who engaged in illegal sexual activity with a minor younger than 12 years old, which the Guidelines consider an aggravating factor. *See, e.g.,* U.S.S.G. § 2G1.3(b)(5) (eight level increase if minor less than 12 years old). A ten year sentence also ensures Mr. Provost is not equated with someone who engaged in actual physical contact with a minor.

F.  **Providing Restitution.**

Mr. Provost has agreed to pay restitution as a condition of his plea agreement. *See* Dkt. 18, Plea Agreement, p. 5, ¶ 10. In calculating a restitution award, this Court must determine the loss amount "directly and proximately" caused by Mr. Provost. *See Paroline v. United States*, 572 U.S. 434 (2014); PSR Sentencing Rec. at 6. That stems from the "bedrock principle that restitution should reflect the consequences of the defendant's own conduct." *Paroline*, 572 U.S. at 455. Here, Mr. Provost agrees that he must pay his fair share of restitution. That means discounting from Mr. Provost's loss amount any losses caused by Mr. Bergin, the individuals located abroad, or the twenty individuals who were also sent nude images by the minor. Mr. Provost anticipates that the issue of restitution will be briefed and dealt with in more detail after he is sentenced.

The critical issue now with respect to the proper custodial sentence to impose is that the longer Mr. Provost is incarcerated, the more difficult it will be for him to make any restitution payments. Thus, the need to give Mr. Provost an opportunity to compensate the minor for the losses he proximately caused her support the ten year sentence jointly recommended by the parties.

G.  **Mr. Provost is Not Subject to the $5,000 Special Assessment Because he is Indigent.**

Under 18 U.S.C. § 3014(a), a "non-indigent person" convicted of an offense in Chapter 117 of

Title 18 (which includes enticement of a minor in violation of 18 U.S.C. § 2422) is subject to a $5,000 special assessment. The qualifier of "non-indigent person" distinguishes this special assessment from the general special assessment statute, 18 U.S.C. § 3013, which mandates a special assessment on all defendants regardless of whether they are non-indigent or not. "Indigent" is a legal term of art, meaning "someone who is too poor to hire a lawyer and who, upon indictment, becomes eligible to receive aid from a court-appointed attorney and a waiver of court costs." *See* "Indigent Defendant," *Black's Law Dictionary* (10th Ed. 2014).

Upon his indictment and appearance in federal court, the Honorable Donna M. Ryu reviewed Mr. Provost's finances, deemed him "indigent" and appointed the Federal Public Defender to represent him. *See* Dkt. 7, 8. To find Mr. Provost "indigent," Judge Ryu determined that Mr. Provost's "net financial resources and income are insufficient to obtain qualified counsel," after considering "the cost of providing the person and his dependents with the necessities of life." 7A Guide to Judiciary Policy § 210.40.30. The $5,000 special assessment in 18 U.S.C. § 3014(a) thus does not apply to Mr. Provost because he is not a "non-indigent person" as required by the statute. The PSR confirms that Mr. Provost does not have the finances to pay a fine and recommends he pay a $100 special assessment. PSR ¶ 91; PSR Sentencing Rec. at 1.

## **CONCLUSION**

Mr. Provost asks this Court to impose the sentence jointly recommended by the parties: 120 months in prison, 10 years of supervised release, and a $100 special assessment. He also asks the Court to recommend the BOP house him at either FCI Danbury or FMC Devens so he can be close to his family in Rhode Island. Finally, he asks this Court to recommend he participate in RDAP.

Dated:   January 3, 2019              Respectfully submitted,

                                      STEVEN G. KALAR
                                      Federal Public Defender

                                           /S/
                                      HANNI FAKHOURY
                                      Assistant Federal Public Defender